[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The court heard evidence simultaneously in the two captioned proceedings: an Application for a Prejudgment Remedy of Replevin, and an Application for a Temporary Injunction to prevent the prejudgment remedy.
Evidence in these two matters was taken over a three day period and it is important to this finding to review the history of the business relationship which existed between the parties leading CT Page 4074-N to this dispute.
In 1992, a corporation known as Meads of Greenwich, Inc. ("MGI") operated a stationery store at 252 Greenwich Avenue, Greenwich, Connecticut. MGI was involved in a Chapter 11 Bankruptcy reorganization and a motion was pending by the State of Connecticut to dismiss or convert the bankruptcy to a Chapter 7 liquidation. At that time, Union Trust Company (the "Bank") was a large creditor of MGI, with loans secured by first liens on all of the inventory, fixtures and other assets of MGI. The bank also issued letters of credit in favor of MGI's landlord representing the security deposit for the store lease. The Bank favored a dismissal of the bankruptcy action in order for it to deal with an offer it had received from Alexander Monaco to purchase the assets of MGI.
The Bank's negotiations with Mr. Monaco, who formed a corporation, Greenwich Stationery Company, ("GSC") resulted in an agreement whereby GSC would purchase the assets of MGI for $200,000.00. The purchase agreement called for a $100,000.00 cash payment on signing, followed by periodic payments of fixed amounts on fixed dates with a final $50,000.00 payment on December 31, 1993. GSC was also simultaneously negotiating for a lease with MGI's landlord, Allied Dunbar. As a part of those negotiations, GSC was to retrieve and deliver to the Bank letters of credit issued by the Bank in the amounts of $42,000.00 and $15,000.00, then held by Allied Dunbar as the security deposit for MGI's lease.
GSC, acting by Alexander Monaco, was negotiating with the Bank's then loan work out officer, James Gareau. In an internal Bank memorandum, dated October 15, 1992, Mr. Gareau stated that he recommended that GSC's offer of $200,000.00 be accepted as he valued the assets to be only $100,000.00 to $125,000.00. He went on in the memorandum to state that the $100,000.00 initial cash payment alone may be more than the Bank might receive if the assets were to be liquidated at an auction. Mr. Gareau's memorandum concluded that GSC's $200,000.00 offer was predicated in part on the fact that Mr. Monaco had negotiated a lease agreement with the landlord, Allied Dunbar, to permit the store to continue operating on Greenwich Avenue, a prestigious retail address.
There was no question that the sale of the assets by the Bank to GSC was contingent upon GSC entering into a lease agreement with Allied Dunbar. It was also obvious that GSC needed a $50,000.00 Letter of Credit from the Bank to provide the required two month CT Page 4074-O security deposit called for under the lease. On December 1, 1992, the attorney representing Mr. Monaco and GSC advised the Bank's attorney of two contingencies which must be satisfied prior to the finalization of the agreement; one, a fully executed lease; two, a $50,000.00 letter of credit to be used as the security deposit under the lease.
The December 9, 1992 application for the $50,000.00 Letter of Credit filed by GSC provided that the beneficiary, Allied Dunbar, could draw on the Letter of Credit on or before January 31, 1994 with an asterisk, followed by the words "Renewable to April 30, 2000".
On December 8, 1992 the Bank issued Irrevocable Standby Letter of Credit Number 5000396. The Letter of Credit has an expiration date of January 31, 1994 with a statement as follows.
 "It is a condition of this letter of credit that it shall be deemed automatically extended without amendment for an additional period of one year from the present or future expiration date unless 60 days prior to such date we shall notify you by registered letter that we elect not to extend this letter of credit for any such additional period. In this event, you may draw hereunder provided your draft is accompanied by your certificate that the underlying obligation of the applicant is still outstanding." (emphasis added)
The Letter of Credit was subsequently amended by Amendment No. 1, dated December 11, 1992 to provide that the Letter of Credit would be automatically extended, without amendment, unless the Bank notified the beneficiary at least ninety days prior to the expiration date. Amendment No. 1 further stated "This Letter of Credit, however, will not be extended beyond April 30, 2000." Italso eliminated the requirement that the beneficiary certify abreach under the lease as a condition of drawing on the Letter ofCredit. (emphasis added)
The letter of Credit was further amended by Amendment No. 2, dated December 17, 1992, which changed the expiration date to April 30, 1994. GSC's witnesses, Attorney Rubino and Mr. Monaco, testified that the two amendments to the Letter of Credit involved changes requested by the beneficiary landlord, Allied Dunbar.
The expiration date of the Letter of Credit was automatically CT Page 4074-P extended for a one year period from April 30, 1994 to April 30, 1995. The new Bank work-out Officer, Paul Cummings, who replaced Mr. Gareau in December 1993, testified that the Credit Service Department acted in error when it extended the maturity date to April 30, 1995.
In December of 1993, Alexander Monaco testified that he contacted Paul Cummings to request an extension of the $50,000.00 final payment date under the note, which was due on December 31, 1993. GSC was experiencing cash shortages, caused, inter alia, by the burden GSC had experienced in paying off MCG's debt with suppliers. Mr. Monaco invited Mr. Cummings to visit the store to see first hand the progress that had been achieved at the Greenwich Avenue store. Mr Cummings did not visit the store nor did he extend the terms for the final $50,000.00 payment under the note. GSC made the final $50,000.00 payment in mid January, 1994.
On January 14, 1994, Mr. Cummings made a memorandum to file stating that $50,000.00, representing payment in full on the note, was paid. The memorandum goes on to say that the Letter of Credit needs to be reviewed. Mr. Cummings, however, notes that the "debtor is being uncooperative in supplying financial statements." Further memorandums to file made by Mr. Cummings indicated that he had talked to Mr. Monaco on January 14, 1994 requesting financial data which Mr. Monaco refused to supply. A January 26, 1995 note to file by Mr Cummings indicates that Mr. Monaco feels that the bank did not treat him fairly. He would not supply financial information required to review the status of the outstanding Letter of Credit.
As previously noted, the Letter of Credit was renewed for another year on January 31, 1994, albeit by mistake according to Mr. Cummings.
On November 18, 1994, Paul Cummings sent a memorandum to Beverly C. Glover, of the bank's international department, advising that the $50,000.00 Letter of Credit contained an automatic renewal provision and would automatically renew for an additional period of time unless the Bank exercised its option to cancel. Mr. Williams quite correctly states that if the Bank elected its option of non-renewal, there was a chance that the beneficiary would draw againstthe Letter of Credit. (emphasis added). On November 26, 1994, the Bank elected not to renew the Letter of Credit.
In an undated letter to Allied Dunbar, the Bank advises Allied CT Page 4074-Q Dunbar that the Bank has elected the option not to renew the Letter of Credit. The Letter to Allied Dunbar, states the Letter of Credit will become null and void after April 30, 1995.
Having no alternative option, Allied Dunbar draws upon the $50,000.00 and, acting through its agent, has the money deposited to its account at the Chase Manhattan Bank of Connecticut., Inc.
The non-renewal of the Letter of Credit was not predicated upon any default by GSC under the terms of its lease with Allied Dunbar.
This case came before this court as a result of the actions of an overly zealous loan officer, who seeks replevin of all the personal property and fixtures of GSC. Such an act would, in all likelihood, put GSC and Alexander Monaco into bankruptcy. Also, the obstinate position of Alexander Monaco in steadfastly refusing to provide any financial data to the Bank, because he feels he has not been treated fairly by the Bank, has protracted a situation that could and should have been resolved.
The Bank clearly understood that the sale of the assets of MGI to GSC was dependent on GSC obtaining a lease of the retail space from Allied Dunbar, in order to permit GSC to continue the retail operations at the Greenwich Avenue site. The Bank's Mr. Gareau, in his October 15, 1992 memorandum, stressed the importance of the lease to the overall transaction.
The Bank, in its post hearing brief, claims "None of the Letter of Credit documents contain even a remote reference to GSC's allegation that the Letter of Credit will be continuously renewed through the year 2000." GSC in its post hearing memorandum states: "As the evidence disclosed, the agreement to renew the Letter of Credit through the year 2000 was memorialized in writing by Attorney James Rubino in his December 1, 1992 escrow letter. This agreement was confirmed by James Gareau, the Bank's workout officer when he conceded that the defendant's position of automatic renewal through January 30, 2000 was correct."
The court finds that the evidence could lead to the conclusion that in the frenetic lease and purchase negotiations, caused in part by Mr. Monaco's urgent need to finalize the transaction in an effort to salvage the 1992 Christmas season, the question of the duration of the Letter of Credit was not given the focus that hindsight now dictates it deserved. CT Page 4074-R
The December 9, 1992 Application For Standby Letter of Credit, filed by GSC, states "renewable to April 30, 2000." The Amendment No: 1, dated December 11, 1992 states, inter alia, "This Letter of Credit however, will not be extended beyond April 30, 2000. Mr. Rubino's December 1, 1992 escrow letter references a $50,000.00 Letter of Credit, but does not mention the duration of the Letter of Credit. The Bank's Mr. Gareau testified on direct examination that the Letter of Credit was to be for one or two years with Monaco to obtain a new Letter of Credit from another bank. On cross examination, Mr. Gareau testified that a Letter of Credit extension was never discussed. He also testified that letters of credit are issued by another department within the bank.
The evidence was unclear as to whether Mr. Cummings was aware of the previous business relationship which existed between the parties. This court can only conclude that it was coincidental that the Bank began to question the credit worthiness of GSC only after the $100,000.00 Non-Negotiable Term Loan Promissory Note and Security Agreement, dated December 17, 1992, had been paid.
Connecticut General Statutes §§ 52-515 provides that "The action of replevin may be maintained to recover any goods or chattels in which the plaintiff has a general or special property interest with a right to immediate possession and which are wrongfully detained from him in any manner, together with the damages for such wrongful detention."
With regard to the identification of the property to be replevined, implicit in § 52-278a through § 52-278h is the requirement that property that is the subject of a prejudgment remedy be identified. The bench and bar of the state have always understood that identification to be a statutory requirement.Shawmut Bank, N.A. v. Valley Farms, 222 Conn. 361, 371. Further, the court finds that the general rule in Connecticut is that claimants who have rights to collect a debt do not have the right to replevin money or any other intangible property. Kosminoff, EtAl v. Norwalk Fast Oil, Inc., Et Al, Superior Court, Judicial District of Stamford/Norwalk at Stamford D.N. CV95 0145751 S.
General Statutes § 52-516(b) provides that "[a] action of replevin, to the extent that it includes a prejudgment remedy as defined in Section 52-278a, shall not be allowed unless the provisions of Sections 52-278a to 52-278f, inclusive, are complied with. Shawmut Bank, N.A. v. Valley Farms, 222 Conn. 361, 370. CT Page 4074-S
A review of all of the evidence, taking into consideration that there was not a scintilla of evidence that GSC was in default under its lease with Allied Dunbar, leads this Court to conclude that the collateral is not in jeopardy. Furthermore, this Court cannot conclude that the Bank has demonstrated probable cause that judgment would be rendered in this matter in favor of the plaintiff, Bank.
The Bank is now known as First Union.
Accordingly, the application for temporary injunction, enjoining the Bank from replevying upon the goods and chattels of GSC, is hereby granted. It therefore follows, that the Bank's application for replevin as a prejudgment remedy is denied.
Dated at Stamford, Connecticut this 14th day of May, 1996.
RICHARD J. TOBIN, JUDGE